**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**MELISSA KAYE MCDIFFITT,**

       **Plaintiff,**

**v.**                       **Civil Action No.: 5:15cv58**
                                   **(The Honorable Frederick P. Stamp, Jr.)**


**CAROLYN W. COLVIN,**
**Acting Commission of Social Security,**

       **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Melissa Kaye McDiffitt ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) for judicial review of the final decision of the defendant, Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DBI") under Title II of the Social Security Act and denying Plaintiff's claim for supplemental security income ("SSI") under Title XVI. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. §§ 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Plaintiff filed her application for DIB on September 5, 2011, and for SSI on September 15, 2011, alleging disability beginning March 10, 2010. Plaintiff's application was denied at the initial and reconsideration levels. Plaintiff thereafter requested a hearing, which Administrative Law Judge Regina Carpenter ("ALJ") held on November 21, 2013, and at which Plaintiff, represented by counsel, and Ms. Beth Kopar, an impartial Vocational Expert ("VE"), testified.

On February 6, 2014, the ALJ entered a decision finding Plaintiff was not disabled. Plaintiff appealed this decision to the Appeals Council and, on March 13, 2015, the Appeals Council denied Plaintiff's request for review thus making the ALJ's decision the final decision of the Commissioner.

## II. FACTS

### A. Personal History

Plaintiff was born on December 20, 1968, and forty-five (45) years old at the time of the administrative hearing (R. 29). Additionally, Plaintiff has a Bachelor's degree in marketing and an Associate's Degree in Fashion Merchandising (R. 30). Plaintiff is unmarried and has no children. Id. She currently has no income and lives with her parents who pay for all her expenses (R. 31). Her last day of work was March 10, 2010 (R. 32).

### B. Medical History Summary

#### 1. Medical History Pre-Dating March 10, 2010

On April 2, 2009, Plaintiff met with Dr. Jonathon Murphy, M.D., for her fibromyalgia and hypothyroidism symptoms (R. 370). Plaintiff stated that she has been having difficulty falling asleep and concentrating on certain tasks. Id. Dr. Murphy noted that she may have hormone deficiency and prescribed her medication to take. Id.

On August 6, 2009, Plaintiff went to Dr. Murphy for sleep, stress, and urination issues (R. 367). Plaintiff indicated her anxiety has worsened as well. Id. Dr. Murphy prescribed more medication. Id.

On November 12, 2009, Plaintiff visited Dr. Murphy complaining of stress (R. 362). Plaintiff reported that she has gained more weight and has had trouble sleeping lately. Id. Dr. Murphy continued her on medication treatment. Id.

On February 25, 2010, Plaintiff met with Dr. Murphy complaining of anxiety, stress, back pain, and fatigue (R. 318). Dr. Murphy noted that Plaintiff was very tearful and emotional. Id. He then prescribed her several medications. Id.

On March 10, 2010, Plaintiff had an appointment with Dr. Murphy regarding her depression and anxiety (R. 316). Plaintiff indicated that she was sleeping better and was less emotional; however, she was still very fatigued. Id. Dr. Murphy prescribed medication as a treatment plan. Id.

*2. Medical History Post-Dating March 10, 2010*

On April 8, 2010, Plaintiff met with Dr. Murphy complaining of anxiety and fatigue (R. 308). Plaintiff indicated that she has trouble sleeping, loss of appetite, and feels "weepy" (R. 353). Dr. Murphy recommended further medication treatment (R. 311).

On April 23, 2010, Plaintiff had a follow-up appointment with Dr. Murphy (R. 351). She indicated that her aches and myalgia symptoms had improved some. Id.

On May 7, 2010, Plaintiff reported to Dr. Murphy. Diagnosed with myalgia, fatigue, and depression, Dr. Murphy recommended further treatment involving medication and rest (R. 301). He also called her prognosis "fair." Id.

On June 11, 2010, Plaintiff visited Dr. Murphy who concluded she had fatigue, myalgia, and cognitive impairment (R. 291). Plaintiff indicated her fatigue has been worsening and as a result has been having issues with her sleeping pattern and bouts of nausea (R. 344). He called her prognosis "fair" and added that Plaintiff would be temporarily disabled from work for one month. (R. 291).

On June 25, 2010, Plaintiff met with Dr. Murphy who concluded that she suffered from excessive fatigue, depression, anxiety, and insomnia (R. 288). He gave her a "fair" prognosis and

further recommended that she undergo hormonal therapy. Id. He also indicated that Plaintiff would be temporarily disabled from work for approximately four months. Id.

On July 23, 2010, Plaintiff met with Dr. Murphy complaining of anxiety, stress, and fatigue (R. 336). Dr. Murphy discussed referring Plaintiff to a psychiatrist for her anxiety issues. Id.

From August 12, 2010, to August 17, 2010, Plaintiff made two trips to the Wheeling Hospital to meet with Dr. Srini Govindan, M.D., with complaints of fatigue and fibromyalgia (R. 234). At the hospital, Plaintiff underwent two sleep studies (R. 234–37). Following the studies, Dr. Govindan concluded both times that additional tests were needed to document hypersomnia and to rule out narcolepsy (R. 235, 247).

On August 31, 2010, Plaintiff visited with Dr. Murphy for a follow-up appointment (R. 330). Plaintiff indicated that she was feeling better, but still has constant fatigue symptoms and feels "weepy" a lot. Id. Dr. Murphy thereafter increased medication dosage. Id.

On September 15, 2010, Plaintiff met with Dr. Scott Burg, D.O., at the Cleveland Clinic Foundation complaining of fatigue; Plaintiff rated her as a 4–5 out of 10 (R. 241, 254). Review of systems revealed that Plaintiff was only positive for depression (R. 242). Physical examination tests came out normal as well (R. 243). Dr. Burg noted "no obvious evidence of an active synovitis" and recommended further testing (R. 244). Tests revealed all normal readings (R. 258–59).

On September 20, 2010, Plaintiff returned to Dr. Murphy for a follow-up on test results (R. 328). Dr. Murphy indicated that Plaintiff was ready to return to work on a trial basis. Id.

On October 13, 2010, Plaintiff met with Dr. Joe El-Khoury, M.D., complaining of nausea and abdominal pain (R. 449). Review of systems and a physical examination revealed no

negative findings (R. 450–52).Plaintiff wished to undergo an esophagogastroduodenoscopy, which was performed on October 22, 2010 (R. 452, 460–61).

On October 18, 2010, Plaintiff reported to Dr. Murphy complaining of fatigue, anxiety, and myalgia (R. 264). Dr. Murphy made the following observations: (1) Plaintiff can engage in limited stress situations and in limited interpersonal relations; (2) Plaintiff can sit/stand/walk for 1 hour; and (3) Plaintiff can frequently lift 10 pounds but can only occasionally lift 11–20 pounds (R. 265). Dr. Murphy further noted that Plaintiff can "work a total of variable number of hours per day," but that she was "unable to perform the job tasks as required by employer." Id. Dr. Murphy recommended job modification and psychological counseling. Id.

On November 15, 2010, Plaintiff met with Dr. Murphy where she was diagnosed with chronic fatigue and fibromyalgia (R. 262). Dr. Murphy noted her prognosis as "guarded" and that indicated that further treatment would be necessary. Id.

On November 18, 2010, Plaintiff met with Dr. Jeffrey Shaw, M.D., regarding her esophagitis (R. 403). Plaintiff also complained of stress, fatigue, muscle aches, and memory problems. Id. Following a physical examination, which revealed no abnormal findings, Dr. Shaw prescribed medication and referred Plaintiff to a nutritionist (R. 409).

On December 6, 2010, Plaintiff presented to Ms. Megan DeRuiter, CFNP. Plaintiff reported having muscle aches, joint aches, GI nausea, and neurological issues (R. 553). Ms. DeRuiter discussed with Plaintiff earlier lab findings and recommended to continue with the hormonal treatment and medication (R. 554–55).

On December 14, 2010, Plaintiff returned to Dr. El-Khoury with abdominal pain and GERD (R. 482). Dr. El-Khoury recommended dietary changes and continued use of medication (R. 491).

On April 7, 2011, Plaintiff met with Dr. John MacCallum, M.D., with abdominal pain, fatigue, and memory loss (R. 513). Plaintiff indicated some improvement in energy levels but still has dizzy spells and stomach issues (R. 514). She also stated that she still has to rest for a bit when finished completing a task before moving on to something else. Id.

On June 7, 2011, Plaintiff returned to Ms. DeRuiter for a follow-up appointment. Plaintiff indicated that she is still fatigued and has aches all over her body (R. 544). Ms. DeRuiter discussed Plaintiff's GI survey, which revealed that Plaintiff has gluten intolerance (R. 545).

On July 6, 2011, Plaintiff met with Dr. MacCallum with fatigue, nausea, and memory issues (R. 509). Plaintiff reported having no energy and having trouble sleeping. Id. She described her memory loss as "terrible." Id. Dr. MacCallum recommended continued medication treatment plan (R. 510).

On August 8, 2011, Plaintiff visited Dr. MacCallum with nausea and other GI symptoms (R. 507). Plaintiff indicated slight change in energy levels, and weight loss. Id. Dr. MacCallum recommended to her to continue losing weight and to still undergo therapy (R. 508).

On August 29, 2011, Plaintiff visited Dr. Marilyn Brady, Ph.D. regarding her psychological issues. Dr. Brady diagnosed her as having adjustment disorder, anxiety, and depressed mood (R. 527). She also indicated that Plaintiff's following levels of functioning were impaired: (1) school/work; (2) activities of daily living; (3) management of finances, free time, relationships; (4) social situations; (5) health care; (6) self-administration of medication; and (7) ability to maintain personal safety and adequate housing. Id. Dr. Brady referred Plaintiff for individual therapy (R. 528).

On September 6, 2011, Plaintiff met with Ms. Barbara Theodoro, M.S., for her anxiety issues, which she described as "severe" (R. 630). After discussing Plaintiff's stress triggers, Ms. Theodoro recommended that Plaintiff continue coming for therapy sessions (R. 631).

On September 12, 2011, Plaintiff met with Dr. Steven Corder, M.D., for a psychiatric evaluation. After speaking with Plaintiff, Dr. Corder diagnosed her with (1) depression and (2) chronic fatigue, hypothyroidism (R. 539). He further classified her prognosis as "poor." Id.

On September 20, 2011, Plaintiff returned to Ms. DeRuiter for a physical examination. Review of systems indicated no change in her fatigue level (R. 541). Plaintiff also reported aches in her muscles and joints, and feelings of being off balance, memory lapse, decreased concentration, and headaches (R. 542). Physical examination revealed tenderness to ankles, knees, shoulders. Id.

On September 20, 2011, Plaintiff met with Ms. Theodoro for her normal session. Plaintiff reported "slow but steady" progress from her last visit and indicated that she has gained some awareness regarding her constant anxiety and stress (R. 635–36). On October 11th, Plaintiff met with Ms. Theodoro for another session. Plaintiff indicated have "decreased symptoms overall" (R. 637). On October 25th, Plaintiff met with Ms. Theodoro for their session. Plaintiff indicated that she still has "moderate level of anxiety" and has increased difficulty with her focusing and organizing her thoughts (R. 639).

On October 28, 2011, Plaintiff went to the Cabell Huntington Hospital complaining of nausea, bloating, abdominal pain, and vomiting (R. 416–433). After meeting with Dr. El-Khoury, Plaintiff was prescribed medication and underwent other examinations. Id.

From October 28, 2011, to November 23, 2011, Plaintiff underwent physical therapy with Mr. Steve Barbe, DPT (R. 580–89). Plaintiff's initial assessment revealed deconditioning and

balance dysfunction (R. 582). Starting on November 2, 2011, and ending on November 11, 2011, Plaintiff made improvements in single leg balancing, trunk stability and strength (R. 583–87). However, on November 18th and 23rd, Plaintiff regressed through her demonstrating weakness in her balance and strength (R. 588–89).

On November 8, 2011, Plaintiff met with Ms. Theodoro for their normal session. Plaintiff reported increased anxiety levels and continued difficulty with her concentration (R. 642). On November 22th, Plaintiff met with Ms. Theodoro. Again, Plaintiff described increased levels of anxiety (R. 644). On December 6th, Plaintiff returned to Ms. Theodoro. She indicated that she anxiety levels have decreased (R. 646). She also reported that she has been able to better focus and organize her thoughts more. Id. On December 20th, Plaintiff reported back to Ms. Theodoro. Plaintiff again indicated a decrease in her anxiety levels and also a better job at focusing and organizing her thoughts (R. 648). On January 10, 2012, Plaintiff visited Ms. Theodoro for their session. She indicated she has "moderate to severe" levels of anxiety (R. 650). She also reported an increase in negative thoughts, which may be due to her being recently denied SSI and short term disability. Id. On January 31st, Plaintiff returned to Ms. Theodoro for their normal session. She indicated "moderate to severe" levels of depression coupled with the fact that medication is no longer helping her control it (R. 658). She stated that she cannot motivate herself to do anything during the day. Id.

From November 30, 2011, to March 6, 2012, Plaintiff resumed physical therapy sessions with Mr. Barbe. Initially, Plaintiff presented weak leg stability and quads (R. 673–676). However, over time, Plaintiff demonstrated improving quad and abdominal strength and better stability overall (R. 677–92).

From February 21, 2012, to August 27, 2012, Plaintiff resumed her therapy sessions with Ms. Theodoro: February 21st Plaintiff's depression was moderate and her concentration levels have improved [R. 783]; February 28th Plaintiff's depression was moderate [R. 781]; March 26th another decrease in depression symptoms and an increase in motivation levels [R. 767]; April 23rd moderate levels of anxiety [R. 765]; May 14th anxiety increased to severe level and has affected her ability to organize/concentrate [R. 763]; May 21st anxiety still at severe level leading to more difficulty in social situations with other people [R. 761]; June 4th depression at a moderate level and an increase in motivation levels [R. 759]; June 18th depression at a moderate level, which has helped improve her concentration [R. 751]; July 16th depression now at severe level, which has affected her motivation levels to complete household tasks [R. 749]; July 30th depression still severe affecting her ability to complete small tasks and make decisions [R. 747]; August 13th depression moderate affecting motivation levels [R. 745]; and August 27th depression severe affecting ability to sleep [R. 743].

From March 29, 2012, to September 4, 2012, Plaintiff resumed physical therapy sessions with Mr. Barbe due to chronic fatigue and weakness (R. 798). Throughout their sessions, Mr. Barbe noted improved strength, balance, and endurance (R. 798–85).

From September 10, 2012, to May 20, 2013, Plaintiff resumed therapy sessions with Ms. Theodoro: September 10th moderate depression increasing motivation levels to complete daily tasks [R.828]; October 8th severe depression leading to more fatigue [R. 826]; November 5th moderate anxiety leading to increase in positive self-thoughts [R. 824]; November 19th severe depression resulting in less patience and increased negative interactions with other people [R. 822]; December 10th severe anxiety [R. 820]; January 14th severe anxiety leading to panic attacks [R. 818]; February 14th severe depression affecting motivation and increase fatigue [R.

810]; February 25th severe anxiety affecting ability to concentrate and focus on simple tasks [R. 808]; March 25th severe depression leading to feelings of hopelessness [R. 806]; April 8th severe depression leading to increased agitation with other people [R. 804]; April 22nd moderate depression [R. 802]; and May 20th moderate anxiety [R. 800].

From March 26, 2013, to March 29, 2013, Plaintiff resumed physical therapy sessions with Mr. Barbe. Plaintiff resumed physical therapy due to her fatigue and weakness (R. 855). Mr. Barbe noted that Plaintiff's problems included decreased balance, endurance, strength, trunk, and function status (R. 858). On March 26th, Plaintiff demonstrated general weakness and deconditioning (R. 859). On March 28th, Mr. Barbe indicated no change (R. 860).

From June 3, 2013, to October 1, 2013, Plaintiff resumed therapy with Ms. Theodoro: June 3rd severe depression resulting in decreased levels of motivation [R. 871]; June 17th moderate depression leading to increased motivation and increased in positive interactions with other people [R. 873]; July 8th severe depression with increase in negative interactions with other people [R. 875]; July 29th severe depression with exacerbated physical and emotional symptoms [R. 877]; August 12th moderate depression with increased tolerance of other people [R. 879]; August 26th severe depression with difficulty in trying to develop goals and tasks to accomplish [R. 881]; September 9th severe depression with increased feelings of hopelessness [R. 883]; and September 23rd severe anxiety with difficulty in focusing and organizing thoughts [R. 885].

## C. Testimonial Evidence

At the administrative hearing held on November 21, 2013, Plaintiff divulged her relevant, personal, and work-related facts. Plaintiff was born on December 20, 1948, and forty-four (44) years old at the time of the administrative hearing (R. 29). Additionally, Plaintiff has a

Bachelor's degree in marketing and an Associate's Degree in Fashion Merchandising (R. 30). Plaintiff is unmarried and has no children. Id. She currently has no income and lives with her parents who pay for all her expenses (R. 31). Her last day of work was March 10, 2010 (R. 32).

Plaintiff testified regarding her most recent employment as manager of a Kroger's grocery store. She stated that she had been working there for about three years starting in January 2007 (R. 32). Her duties as manager were to ensure that the store was operating smoothly, hire employees, and train those new hires. Id. During a typical work day, Plaintiff stated that she was working in an office and on her feet. Id. Additionally, she sometimes had to stack boxes weighing close to 30–40 pounds (R. 33). When asked why she quit working at Kroger's, she stated it was because she "was ill." Id.

Plaintiff next testified about her tenure as a furniture salesperson at Contemporary Galleries. She indicated that she worked there for approximately ten (10) years. Id. Part of her duties was to interact with customers, and sell contemporary and Scandinavian style furniture. Id. Also, Plaintiff stated that she had to move furniture when setting up displays in the store (R. 34).

Plaintiff then proceeded to describe why she could not work anymore. She stated that she is in constant "exhaustion" and has "trouble getting up and doing things at times." Id. On good days she can move around the house some, but on bad days Plaintiff stated that she has an "overwhelming sense of exhaustion and fatigue" that does not seem to end. Id. During a normal week, these good days and bad days fluctuate (R. 35).

Regarding her actual medical diagnoses, Plaintiff stated that her medical conditions include chronic fatigue, fibromyalgia, hypothyroidism, and memory/concentration issues. Id. Focusing on her fibromyalgia, Plaintiff testified that she "ache[s] and hurt[s] all over," but that it is somewhat mild and can be dealt with. Id. To treat her fibromyalgia when it is really painful,

Plaintiff stated she takes ibuprofen and undergoes physical therapy twice a week if she is not feeling too exhausted (R. 36). She also stated that she is currently in therapy for her depression and anxiety issues (R. 37).

Plaintiff then described her typical day at home. Throughout the day, Plaintiff stated that she sits on the sofa a lot, cooks small meals, do simple household chores, and naps (R. 37–38). She does try to still make it to church every Sunday though (R. 39). She also indicated that she has trouble sleeping at night. Id.

The ALJ then asked Plaintiff regarding her symptoms associated with her fatigue. Plaintiff replied that she has nausea sensations and headaches (R. 39–40). To combat this, she stated she takes supplements to calm her stomach and to help get some sleep (R. 40).

### D. Vocational Evidence

Ms. Mary Kopar, an impartial vocational expert, also testified at Plaintiff's administrative hearing. The VE characterized Plaintiff's previous work history as (1) store manager, skilled, light exertion per the DOT and medium exertion perform; (2) furniture sales, semiskilled, light exertion and medium exertion as performed (R. 42).

The ALJ then posed the following hypothetical to the VE:

> Now, if we assume an individual the same age, education and work background as the Claimant, who is capable of performing sedentary work as defined in the regulations but with the following limitations: A person can lift up to 20 pounds occasionally. There should be no crouching, crawling, climbing of ladders, ropes or scaffolds; no more than occasional balancing, stooping or climbing of stairs or ramps. There should be no concentrated exposure to extreme heat and cold, wetness and humidity, vibration, respiratory irritants or hazards such as dangerous moving machinery or unprotected heights. The work should be limited to simple, routine and repetitive instructions and tasks and there should be no assembly lime, no fast paced production requirements and no interaction with the public. Would such a person be able to perform any of the Claimant's past work?

(R. 42–43). The VE testified that such a person could not, but could do the following three occupations: (1) laminator; (2) polisher; and (3) ticket checker (R. 43). VE further added that 15% of time is allowed to be off task and that a person could miss up to one day per month (R. 44).

VE testified that her testimony was consistent with the <u>Dictionary of Occupational Titles</u>. <u>Id.</u> Plaintiff's attorney did not question the VE. <u>Id.</u>

## E. Medical Reports and Lifestyle Evidence

### 1. Disability Reports

On October 3, 2011, Plaintiff completed a disability report. In the report, she indicated the following medical conditions that prevented her from working: (1) fibromyalgia; (2) chronic fatigue syndrome; (3) hypothyroidism; and (5) inability to think, concentrate, or retain information (R. 161). In addition, her job history includes time as a manager of a grocery store, office clerk in the Wetzel County Assessor's Office, and a salesperson in a furniture store (R. 162). Finally, she indicated she is on a long list of medications and that she has been to several doctor offices for her conditions (R. 164–75).

On February 14, 2012, Plaintiff filled out another disability report. She stated that there had been no changes in her medical or physical/mental limitations (R. 201). In essence, all she reported was that she had been to more doctors and was taking new forms of medication (R. 202–06).

On July 24, 2012, Plaintiff completed another disability report. Plaintiff indicated no change in her medical conditions or physical/mental limitations (R. 220). She did indicate, however, that she had seen other doctors and had taken different medication (R. 221–25).

### *2. Residual Functional Capacity Report*

On December 27, 2011, Dr. Rabah Boukhemis, M.D., completed a RFC assessment of Plaintiff. Plaintiff had the following exertional limitations: (1) occasionally lift and/or carry 20 pounds; (2) frequently lift and/or carry 10 pounds; (3) stand and/or walk for a total of at least 2 hours in an 8-hour workday; (4) sit for about 6 hours in an 8-hour workday; and (5) unlimited ability to push and/or pull (R. 614). Regarding Plaintiff's postural limitations, Plaintiff could frequently balance, stoop, and kneel, but could only occasionally climb, crouch, and crawl (R. 615). Plaintiff had no manipulative, visual, or communicative limitations (R. 616–17). Finally, Plaintiff was indicated to avoid concentrated exposure to (1) extreme cold, heat; (2) wetness; (3) humidity; (4) vibration; (5) fumes, odors, dusts, gases, poor ventilation; and (6) hazards such as machinery and heights (R. 617).

### *3. Medical Opinions*

On December 23, 2011, Plaintiff met with Dr. James Binder, M.D., for a psychiatric review technique (R. 599). Dr. Binder classified her medical dispositions as "not severe," and noted that she has affective disorders, anxiety-related disorders. Id. Regarding her functional limitations, Dr. Binder concluded that Plaintiff had mild limitations in: (1) restriction of daily living activities; (2) difficulties in maintaining social functioning; and (3) difficulties in maintaining concentration, persistence, or pace (R. 609). In his assessment, he opined that Plaintiff's physical conditions impact her functioning, but that her anxiety and depression do not (R. 611).

On June 14, 2011, Plaintiff met with Dr. Raymond DiPino, Ph.D., for a neuropsychological evaluation (R. 498). After the evaluation, which consisted of several different psychological test, Dr. DiPino made the following conclusions: (1) difficulty on visual

tracking task; (2) normal verbal acquisition; (3) verbal retention stable; (4) verbal fluency below expectation; (5) intellectual functions intact except for weakness in working memory; (6) spatial functions intact; and (7) manual dexterity below expectation (R. 501). Dr. DiPino opined that the difficulties Plaintiff suffers from "may be related to variability in her attention, which may be secondary to changes in her physical functioning, level of somatic concerns and variations in her mood." Id.

On May 7, 2012, Ms. Jennifer Robinson, M.A., completed a consultative examination report on Plaintiff's disability status. Ms. Robinson indicated that Plaintiff's chief complaint for disability was her chronic fatigue (R. 695). Plaintiff stated that she is "exhausted all the time," cannot concentrate or think, has sleep issues, and has nausea (R. 696). Ms. Robinson's diagnostic impressions were (1) depressive disorder; (2) fibromyalgia, chronic fatigue, and hypothyroidism (R. 697). She further described Plaintiff's prognosis as "fair." Id. She also noted that Plaintiff's social functioning, concentration, persistence, pace, and immediate memory were within normal limits (R. 697–98).

On June 5, 2012, Dr. Joseph Shaver, Ph.D., completed a psychiatric review of Plaintiff. Dr. Shaver indicated her medical dispositions were "not severe" (R. 701). He further classified with depressive disorder (R. 704). Regarding Plaintiff's degree of limitations, Dr. Shaver noted that she has mild limitations in: (1) restriction of activities of daily living; (2) difficulties in maintaining social functioning; and (3) difficulties in maintaining concentration, persistence, or pace (R. 711).

### 4. Adult Function Reports

On December 21, 2011, Plaintiff filled out an adult function report. She reported that she suffers from joint pain, muscle pain, chronic fatigue, memory loss, and inability to concentrate

and retain information (R. 176). When describing her typical day, Plaintiff that she goes to physical therapy, rests on the sofa, watches television, nap, fix small meals, and shower (R. 177). She did indicate that she sometimes watches her four-year-old niece. Id. In addition, Plaintiff stated she cooks meals when not tired, does a small range of household chores, shops one or two times a month, visits with friends, and talks with family (R. 179–82). Her conditions, however, have limited her ability to lift, squat, bend, stand, reach, sit, and kneel for prolonged periods of time (R. 184).

On February 29, 2012, Plaintiff completed another adult function report. She repeated that she still suffers from joint pain, muscle pain, chronic fatigue, which all requires her to rest on a frequent basis (R. 208). She stated that her daily activities have not changed from her last function report (R. 209). She further indicated that her personal care needs have become more difficult for her to do. Id. Nonetheless, she reported that she tries to cook meals daily, helps with a few household chores, go shopping a few times a month (R. 210–12). When describing her limitations, Plaintiff indicated that her conditions have negatively affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb, memorize, understand, and concentrate (R. 213–14).

### 5. Pain Questionnaires

On December 21, 2011, Plaintiff completed a pain questionnaire. She described her daily foot pain as achy that lasts all day and worsens after standing and walking for a prolonged period (R. 187). She next indicated that she suffers from neck pain and headaches 1-2x per month that will last all day and will cause her concentration problems (R. 188). Regarding her hip pain, Plaintiff stated it aches and will flare up 5x per week (R. 190). The pain will last all day, and makes it difficult to stand, walk, bend, and climb the stairs. Id.

*6. Work History Reports*

On December 21, 2011, Plaintiff filled out a work history report. She reported that she has had three jobs over the past fifteen years: (1) co-manager of a Kroger grocery store; (2) sales associate at a furniture store; and (3) office clerk at the Wetzel County Assessor's Office (R. 192). Regarding her time at Kroger, Plaintiff stated that she would walk 7-8hrs a day and stand/sit/climb/kneel/crouch/handle large objects 1-2hrs a day (R. 193). She further elaborated that she would lift boxes weighing 10 pounds. Id. Moving to her time as a furniture salesperson, Plaintiff indicated that she would walk 2-3hrs a day, sit 5-6hrs a day, and stand/climb/kneel/crouch 1-2hrs a day. While she frequently would carry objects less than 10lbs, she noted that the heaviest items she carried were 50lbs (R. 194). Finally, as an office clerk, Plaintiff stated that she did not lift very much and would only sit and stand for 3-4hrs a day (R. 196).

## III. THE FIVE STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2004). The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the [RFC] of the claimant is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2015); 20 C.F.R. § 416.920 (2012). In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once this is proven, the burden of proof shifts to the Government during step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled at any of the five steps, the process will not proceed to the next step. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

## IV. THE ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015

2. The claimant has not engaged in substantial gainful activity since March 10, 2010, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).

3. The claimant has the following severe impairments: chronic fatigue syndrome; fibromyalgia; hypothyroidism; obesity; major depressive disorder; anxiety disorder; and adjustment disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual function capacity to perform a range of sedentary work as defined in 20 CFR 404.1567(a) subject to several additional nonexertional limitations. More specifically, the claimant can: lift and/or carry 20 pounds occasionally and occasionally balance, stoop, and climb ramps/stairs. However, she cannot crouch, crawl, or climb ladders/ropes/scaffolds. She must avoid concentrated exposure to extreme heat and cold, wetness, humidity, vibration, respiratory irritants, or workplace hazards such as dangerous moving machinery or unprotected heights. Additionally, the claimant is limited to simple, routine, and repetitive instructions and tasks that take place in a low stress setting defined as requiring no assembly line, fast-paced production requirements, or more than occasional changes in routine or work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on December 20, 1968, and was 41 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual 45–49 (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1596, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 10, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## V. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1. The ALJ Erred in Her Analysis of the Plaintiff's Fibromyalgia, Pursuant To SSR 12-2p.

2. The ALJ Erred in Her Analysis of the Plaintiff's Chronic Fatigue Syndrome, Pursuant To SSR 99-2p.

The Commissioner contends:

1. Substantial Evidence Supports the ALJ's Three-Step Finding That McDiffitt's Fibromyalgia and Chronic Fatigue Syndrome Did Not Medically Equal A Listed Impairment

2. Substantial Evidence Supports the ALJ's RFC Finding That McDiffitt's Fibromyalgia and Chronic Fatigue Syndrome Did Not Result In A Disabling Work-Related Limitations

## C. Substantial Evidence Does Not Support the ALJ's Analysis on Plaintiff's Fibromyalgia and Chronic Fatigue Syndrome

Plaintiff first contends that the ALJ erred in her analysis of her fibromyalgia and chronic fatigue syndrome (CFS) (Pl.'s Br. at 7, 10). Specifically, Plaintiff asserts that the ALJ "failed to evaluate the Plaintiff's fibromyalgia [and CFS], the corresponding symptoms, and the amount of testing that Plaintiff went through to determine the reason for her symptoms." Id. Because the ALJ determined that Plaintiff's fibromyalgia and CFS were severe impairments, Plaintiff argues that the ALJ should conducted a more thorough discussion on whether her fibromyalgia or CFS equaled a listing as required under SSR 12-2p. Id. at 9–10.

Defendant counters that the ALJ did not need to conduct a step-by-step analysis regarding whether fibromyalgia or CFS equaled a listing (Def.'s Br. at 6). Instead, the Fourth Circuit Court of Appeals only requires a "cursory explanation" as long as the evidence is discussed elsewhere in the opinion. Id. In addition, Defendant notes that Plaintiff has also failed to present evidence that listing 14.09D is most analogous to her fibromyalgia. Id. at 8–9.

In her reply, Plaintiff states that under this Court's ruling in Hook v. Commissioner of Social Security, No. 1:14cv126, 2015 WL 518645 (N.D. W. Va. Feb. 6, 2015), the ALJ "has a duty to identify and compare the criteria of relevant listings to the claimant's symptoms, in more than a 'summary' way" (Pl.'s Reply at 2). Furthermore, Plaintiff argues that this omission cannot be considered harmless because the ALJ provided no avenue for a reviewing court to determine whether substantial evidence supported she analysis. Id. at 3.

In the opinion, the ALJ concluded that, although Plaintiff's fibromyalgia and CFS were severe impairments, Plaintiff did "not have an impairment or combination of impairments that met[ ] or medically equal[ed] the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1" (R. 11–12). To reach this conclusion, the ALJ stated that she "reviewed [Plaintiff's] physical and mental impairments using Section 1.00 (Musculoskeletal); Section 9.00 (Endocrine); and Section 12 (Mental), specifically 12.04 (Affective disorders) and 12.06 (Anxiety related disorders) of the Listing of Impairments contained in 20 CFR Part 404, Appendix 1 to Subpart P" (R. 12). She furthermore stated that none of Plaintiff's examining physicians "reported any of the necessary clinical, laboratory, radiographic, or mental status examination findings specified therein." Id.

The listings under the regulations, located at Appendix 1, Subpart P of Part 404, are "descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect" with each impairment "defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 529–30 (1990). Used as a regulatory device, the listings quicken the decision-making process to identify claimants whose impairments are so severe that they would be found disabled regardless of the vocational background. Id. at 532.

A claimant bears the burden of demonstrating that his impairment meets or medically equals a listed impairment. Kellough v. Heckler, 785 F.2d 1147, 1152 (4th Cir. 1986). As the Supreme Court has stated:

> The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just "substantial gainful activity." . . . The reason for this difference between the listings' level of severity and the statutory standard is that, for adults, the listings were designed to

operate as a presumption of disability that makes further inquiry unnecessary. That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work.

Zebley, 493 U.S. at 532 (internal citations omitted).

Nevertheless, when evaluating whether a claimant meets one or more of the listed impairments, the ALJ must identify the relevant listings and then compare each of the listed criteria to the evidence of the claimant's symptoms. Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). This analysis therefore "requires an ALJ to compare the plaintiff's actual symptoms to the requirements of any relevant listed impairments in more than a 'summary way.'" Id. at 1173. The ALJ thus cannot give "a mere conclusory analysis of the plaintiff's impairments pursuant to the regulatory listings." Fraley v. Astrue, No. 5:07CV141, 2009 WL 577261, at *25 (N.D. W. Va. Mar. 5, 2009). This Court has further held that an ALJ's finding will not be upheld if the ALJ simply restates verbatim the language of the relevant listings. Hardman v. Comm'r of Soc. Sec., No.: 5:14CV132, 2015 WL 1221357 (N.D. W. Va. Mar. 17, 2015) (internal citations and quotations omitted). In sum, this Court, and others throughout the District, have routinely held that an ALJ must provide a sufficient explanation at step three, or substantial evidence will not be found to support the ALJ's decision.

The ALJ's step three analysis here is inadequate. The ALJ's step three analysis states nothing about Plaintiff's fibromyalgia or her CFS (R. 12–14). Instead, the ALJ simply stated that she reviewed Plaintiff's "physical and mental impairments using Section 1.00 (Musculoskeletal); Section 9.00 (Endocrine); and Section 12 (Mental), specifically 12.04 (Affective disorders) and 12.06 (Anxiety related disorders) of the Listing of Impairments contained in 20 CFR Part 404, Appendix 1 to Subpart P" (R. 12). Consequently, the ALJ then delved into a discussion regarding

Plaintiff's obesity and mental disorders (R. 12–14). This bare minimal analysis will not suffice. See Cook, 783 F.2d at 1173.

The ALJ must provide a minimal level of analysis that enables reviewing courts the ability to "track the ALJ's reasoning and be assured that the ALJ considered the . . . important evidence." Lilly v. Astrue, No. 5:07cv77, 2008 WL 4371499, at *3 (N.D. W. Va. Sept. 22, 2008). Because the ALJ failed to discuss Plaintiff's two severe impairments, this Court shall not attempt a fact-finding expedition to discern whether the ALJ's ultimate conclusion can be supported by the record—that must be done by the ALJ. Therefore, the ALJ's step three analysis is not supported by substantial evidence.

## VI. RECOMMENDED DECISION

For the reasons herein stated, I accordingly recommend Defendant's Motion for Summary Judgment [Doc. No. 13] be **DENIED,** and Plaintiff's Motion for Summary Judgment [Doc. No. 10] be **GRANTED** and this matter be **REMANDED** for further consideration on the specific issues set forth within.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 13th day of July, 2016.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE